## ROWLAND *v.* EVANS.

In ejectment, the heirs may show that a will admitted to probate was void on account of the insanity of the testator; the decision of the register not being conclusive as to a will of lands, as it is of a will of personalty, until appealed from.

IN error from the District Court of Allegheny county.

*Sept.* 24. The plaintiffs were the heirs-at-law of Evans, and brought an ejectment for his land. The defendants claimed under his will, which had been admitted to probate. The plaintiffs offered to prove the insanity of the testator at the time of making the will.

The court (LOWRIE, J.) rejected the evidence, saying:—

"I am not at all able to appreciate the argument that suggests, that this court would act with becoming modesty, by following the track of the old law on the subject of the effect of probates of wills; and leaving it to our judicial superiors to find out whether or not a new track has been laid, as a substitute, by legislative authority. The Supreme Court having but little original jurisdiction, nearly all questions of law must, of necessity, be first decided by the inferior tribunals, before they can be brought under the consideration of that court; its office being, generally, to sanction what is right, and annul what is wrong in the decisions of the inferior courts; and I hold that these courts act with becoming respect to their judicial superiors, and to their station, only when they earnestly investigate and conscientiously decide, according to the best of their learning and ability, the various questions that properly arise in the progress of the causes tried before them.

"The question here is not whether the former decisions of the Supreme Court on this subject are right: for that is a question that this court cannot entertain. But the question is, has the law on this subject been altered by legislative enactments? A question which, so far as I know, has not yet been mooted. If the former were the question, and could be heard here, I should not hesitate to say that the former decisions were right—clearly right—and that the courts could not have decided otherwise without an invasion of the functions of the legislature.

"The question is, what is now the law as to the efficacy of probates of wills, since the act of the legislature of 15th March, 1832? Dunlop's Laws, 453. To answer this question intelligently, we must recall the law as it stood before the passage of that act, and as we derived it from our English ancestors.

"In England, the ecclesiastical courts, with some few baronial courts, could alone entertain jurisdiction of the probate of wills. But this probate was only for the purpose of fixing the disposition of the personal estate. These courts had no kind of jurisdiction over titles to land, and their probate did not establish even a legacy if charged upon land. As to personal property, and the title of the executors or administrators to administer, the decisions of these courts were conclusive. Probate by the ordinary could not be impeached, except on appeal, to be tried before his judicial superiors. For the purpose of disposing of the personalty, a will did not need to be proved by three witnesses; and it was, in fact, often proved in the *common form* by one witness, and even by the oath of the executor alone. Even when proved in *solemn form*, with notice to all persons interested, it was before the same tribunals, and could affect only the personalty; the difference between the two forms being, that when proved in *common form*, any one interested could afterwards require probate in *solemn form;* and this form was often, as a matter of caution, pursued in the first instance.

"There was, in fact no such thing as a probate of wills of land, properly speaking. The probate was no evidence of title to land. The will *alone* was evidence; and that must be proved, on the occasion, in the same manner as any other muniment of title. But decisions within the province of the ecclesiastical courts, relating to the personalty, were conclusive. The signature of the testator, the appointment of executors and administrators, the sanity of the testator, the absence of fraud in making the will, were all conclusively settled by the decree, so far as related to the personalty, and the decree was necessary to the executor's title to administer; and to the claim of the legatees under the will. These are elementary principles in the history of the law of probates, and may be found in all the books; 2 Roper on Legacies, 531; 1 Wms. Ex'rs, 159, 166, 185, 192, 215, 339—346; 2 Selw. N. P. 12; Lovelass on Wills, 381, 408; Steph. N. P. 1905; Peebles' Appeal, 15 Serg. & Rawle, 39; 3 Term Rep. 125.

"At common law then, we had no such thing as a probate of a will of real estate. It was liable to be disputed whenever and as often as it was set up in any judicial proceeding as evidence of title. If disputed in a chancery proceeding, an issue of *devisavit vel non* was framed and tried before the common-law courts. If disputed in an action of ejectment, the probate was not even *primâ facie* evidence, but the document was to be proved, just as deeds were proved. And whether the question was tried at law or in

chancery, nothing was established except for the purposes of the particular case, and between the parties then litigant.

"How then was the common law altered by our old statutes? No further, I suppose, than the law was altered in relation to deeds. Proved copies, and of course proved originals, were made evidence. Many wills of lands lying in Pennsylvania were necessarily in the custody of the ecclesiastical courts in England: because the testators lived and died there, and there the wills were proved. The inconvenience of sending thither for wills and their proof in all cases where the devisee's title might be disputed, was sufficiently manifest. It was therefore provided that wills proved should be *primâ facie* evidence of title to land, and also certified copies of wills, proved before certain courts in England. This was treating a will of land in the same manner as deeds of land are treated under our recording acts. The probate of a will was allowed as much force as the acknowledgment or probate of a deed of conveyance. As to wills made abroad, the proceeding could with no kind of propriety be considered as conclusive, for it was entirely *ex parte*, and not subject to appeal; for the probate was to be made before courts in England deriving their authority from our provincial acts alone, and therefore they were, in the exercise of it, subject to no direct supervision; Act of 1705; 1 Dallas' Laws, 53; and I have not been able to discover that wills made at home were intended to be placed upon any different footing. I do not know that a foreign probate can have even so large an effect in relation to land now, under the act of 1832, s. 12.

"Our register and register's court were substituted for the ecclesiastical courts, with the additional authority that probate before him, and certified copies of wills so proved, were received as *primâ facie* evidence of a will of land; and I am not able to see that the simple provision of the act of 1791, (3 Dallas' Laws, 167,) that the register's decisions generally should be subject to appeal, and that the register's court may frame an issue to try disputed facts, could of itself be construed into a general alteration of the law as to the effect of his probate. These were simply attempts to remedy special defects, and have no pretensions to a general systematizing of the law; and they make no provision for effecting a conclusive decree by bringing in all the parties interested.

"How far, then, has the law of probates been altered by the act of 1832? That act seems to me to be intended to provide a complete system, to the entire exclusion of the common-law modes of

testing the validity of wills. From the beginning to the end of the act, no distinction is made between wills of realty and wills of personalty : except in sect. 12, which provides for the effect of foreign probates of wills on the title to personalty alone. If then the probate can be collaterally assailed as to the real estate, why not as to the personal estate also? Is it because it was so at common law? The reason is without foundation, for there was no such thing as a judicial probate of a will of real estate at common law. Is the one act of probate half judicial, and half ministerial, in undivided and indivisible moieties? Can there be an appeal as to its effect on personalty, and not as to its effect on realty? Is it not manifest that the legislature intended that the testamentary disposition of both real and personal estate should abide the same fate, and stand or fall in the same assault? The register is expressly and largely clothed with judicial powers as to both kinds of wills indiscriminately, (Act of 1832, ss. 7—11, 31, &c.,) as largely as the ecclesiastical courts are in relation to wills of personalty; and how can we say that he acts judicially only as to the personalty? And if he acts judicially, why are not his judgments to have the same force as all other judgments have, according to the principles of the common law, unless the legislature have expressly declared otherwise? To draw such a distinction here, would seem to me to be to construe away the act of Assembly.

"All the powers of the ordinary in England are given with reference to wills of personalty only; and within this province they are exercised conclusively. Our register has the same powers in relation to every kind of will; and why are they not exercised with equally conclusive effect to their whole extent? He has the same power of granting letters testamentary and of administration, of compelling the production and proof of wills. His jurisdiction is limited by the residence of the deceased in a similar way; and his acts beyond his jurisdiction may be equally impeached; Act of 1832, ss. 5—11, 27; 1 Williams on Ex'rs, 166, 185, 346; Loveless on Wills, 385. The legislature has clearly made him a judicial officer, and we must presume that they intended to make the exercise of his jurisdiction subject to the usual rule, that his judgments, within his jurisdiction, cannot be inquired into collaterally. Indeed they have shown this intention by carefully excepting some of his acts out of the rule, and declaring them void; Act of 1832, ss. 5, 6, 27. The ordinary had to decide as to the signature, sanity, fraud, &c., in a will of personalty, and his decree was, *quoad hoc*, conclusive. Our ordinary, the register, is bound to make the same decision both as to personalty and realty; and I can imagine no

reason why his decree should be conclusive as to the one, and not as to the other.

"Add to this, as a further evidence of the intention of the legislature, that they have made full provision for a contest, before a jury, of the whole question of the validity of the will; and have required that, not legatees only, but heirs, devisees, and all persons interested in both the real and personal property, shall be made parties, and that each shall have a right to raise such objections to the will as he may think proper. This is by means of a *caveat*, or by an appeal from the register, and not in a collateral proceeding. Now this seems to me to be the very same remedy, in a simpler form, which exists in England in the form of a bill to establish a will, with this exception, that that is an entirely independent and collateral proceeding, and may be resorted to or not, while ours is but a continuation of an original necessary proceeding, and in its determination must conclusively settle all matters touching the validity of the will; 2 Story's Eq. §§ 1445–1449. This was the only mode in England of establishing or annulling a will against all claimants, and in this way it was effectually done. We have adopted the same mode *as a part of the proceeding in all cases of probate;* and why should it not be equally conclusive; and being a part of the necessary form, why should it not be exclusive of all the old forms of testing the validity of wills? These views will be found to accord with the principles entertained on this subject elsewhere; 16 Mass. 433; 1 Pick. 114, 535, 549; 6 Monroe, 523, 527. 3 J. J. Marshall, 200; 9 Ohio Rep. 96; Ohio Stat. 995; Mass. Laws, 421; 2 Peters, 255; 12 Mass. 533; 4 Mason, 461.

"I need not allude to the inconvenience of allowing a will duly proved to be disputed by the heir in an action of ejectment; or perhaps in three actions of ejectment for each tract of land, or by a dozen heirs and legatees with a proportional increase of actions—here an heir recovering and there being defeated—some legatees with charge upon land recovering and some failing—the will standing as to the personal estate and cut to pieces as to the real—so that in the end, a man's property may be disposed of less according to his last wishes, than if he made no will at all. The case in hand furnishes, itself, a strong illustration of the evil intended to be provided against; for here is a will allowed to stand as to the personalty; while I discover four suits on the list, and there might have been a dozen, to try collaterally its validity as to land. Our counties should have broad shoulders to bear such burdens of litigation. I cannot suppose that when the legislature were providing a system

on this subject, they designed to leave that system open to so serious an objection, and that the form of trial provided by them was merely to be added to the countless chances of litigation which were already open to the parties in such cases.

"I cannot therefore avoid the conclusion that this probate is conclusive until annulled by an appeal from the decision of the register; and it seems to me that the Supreme Court meant no less than this, when they decided the case of Loy v. Kennedy, 1 Watts & Serg. 399, and declared (per Mr. Justice Rogers) that the act of the register in admitting a will (of land) to probate is a judic. act; and the only remedy for the party aggrieved by his decree is by appeal to the register's court, and that even if the will be defectively proved, "this does not prevent it from being *primâ facie* testimony *at least*, and as such admissible in evidence."

The evidence is therefore rejected.

This was the only error assigned.

*Mahon* and *Hampton*, for plaintiffs in error, were stopped by the court, who called upon

*Williams*, for defendant in error, to support the judgment. He cited Loy v. Kennedy, 1 Watts & Serg. 396; Carpenter v. Cameron, 7 Watts, 51.

*Oct.* 9.    BELL, J.—Upon the ground that the probate of James Evans's last will, before the register of wills of Allegheny county, is conclusive upon the question of title to the land, sought to be recovered in the action of ejectment, and bars further inquiry into the validity of that instrument, the court below rejected the evidence offered by the plaintiff to establish the asserted fact that the testator was of non-sane memory at the time the alleged will was executed. Whether this rejection of the proffered evidence involves an error, is the only question presented by this record.

Before the act of the 15th March, 1832, it had been definitively settled by repeated decisions in this state, that the sentence of a register of wills admitting to probate a last will, the decree of a register's court, and even the verdict of a jury, on an issue of *devisavit vel non*, directed to try the sufficiency of the supposed testament, was conclusive only upon the disposition of the personal estate of the decedent, and could not be set up to stop a party claiming an estate by descent in the lands devised, from averring the invalidity of the testamentary disposition; and the same rule permitted one claiming land by virtue of an alleged will to establish

its validity by proof *in pais*, at common law, though condemned by the decision of a register, refusing to admit it to probate. The question was agitated in this court several times, and always resulted in the same conclusion; that those asserting an interest in realty were at liberty to try the efficacy of their titles in an action of ejectment, upon common-law proof, irrespective of the sentence of the register or the result of the proceedings directed by him. The decisions, establishing this principle as the undoubted law of Pennsylvania, commence as early as the year 1774, and will be found collected by the late Mr. Justice Kennedy in the elaborate opinion delivered by him as the organ of the court, in Smith *v.* Bonsall, 5 Rawle, 80. The truth is, that, at common law, there was no such thing as probate of a devise, simply of realty, before the ordinary, or his substitute, because of lack of jurisdiction in the ecclesiastical courts over the subject; and although, under our earlier statutes, a practice grew up of accepting a probate of a will of lands as *primâ facie* evidence of title, the parties in interest were left at liberty to attack, or might be called upon to support, *per testes*, the alleged testamentary writing in any form of action proper to settle the question of estate. Has our law undergone an alteration in this particular? The learned judge, before whom the cause was tried in the district court, returns an affirmative answer to this question, and founds his response upon the general provisions of the act of 1832, relating to registers of registers' courts, already referred to. The argument, stated briefly, is, that the registers of wills of the several counties are judicial officers, clothed, by the act, with power to take probate, indifferently, of wills of lands and testaments of chattels—the statute making no distinction between the kinds of testamentary writings, and pointing out no difference in the legal effect to be ascribed to the act of probate; and, therefore, it is said the decree of the officer is in each case alike, a judicial decision, directly upon a subject entrusted to his jurisdiction; and which, like other judgments, cannot be impeached collaterally, or overhauled, except in the mode pointed out in the act, by appeal. That the register is a judicial functionary, and his decrees, within certain limits, conclusive until reversed on appeal, is not to be questioned; and as, by the terms of the statute, he is empowered to take probate of wills generally, it would, at first blush, appear anomalous to ascribe a binding efficacy to one act of probate which is denied to another, or to accord different degrees of stringency to the same probate. The reasoning which disputes the propriety of this is not without seeming

force, and, hastily considered, would appear difficult to answer. But an attentive consideration of the subject satisfies us that it is founded upon the radical error of imputing to the legislature an intent nowhere sufficiently manifested to alter a settled rule of the common law.

A glance at the various statutes that have, from time to time, been enacted upon the subject, will show that their language, descriptive of the general power of probate to be exercised by the register-general and his deputies, and afterwards by the county registers, is as broad and comprehensive as that used in the act of 1732. The act of 1705 directed the appointment of a register-general and deputies in the several counties, *for the probate of wills* and granting letters of administration. The act of the 7th of June, 1812, empowered the register-general and his deputies, with the assistance of two or more justices of the Court of Common Pleas, to hear and determine *caveats* entered against the proving of any will or granting letters of administration, and matters in controversy; and the act of the 13th of April, 1791, gave an appeal from the definitive sentence or decree of the register's court, to the high court of errors, and directed the former tribunal, upon the application of either of the parties litigant, to send an issue into the Court of Common Pleas, for the trial of disputed facts, and that, after a verdict establishing such facts, they should not be re-examined upon appeal. This was followed by the acts of the 30th of September, 1791, giving an appeal from the acts and decisions of the several registers to the respective registers' courts, and 19th of April, 1794, providing an appeal from the final decrees and sentences of registers' courts to the Supreme Court; and of the 26th of February, 1806, constituting the register, and two of the judges of the Common Pleas of each county, the registers' court. No distinction is made, in terms, by these statutes, so far as the jurisdiction of the register is concerned, between devises of realty and bequests of personalty; and, under the system established by them, it became the almost every-day practice in Pennsylvania to test, in the first instance, the validity of last wills, irrespective of the nature of the property disposed of; and the law so far sanctioned this practice as to recognise a register's probate of a will of land as *primâ facie* evidence, and compelling him who called into question the instrument so authenticated, to impeach its validity by counter proof. Still, as we have seen, the distinction between decrees touching the disposition of personal estates and those affecting realty, was uniformly and steadily maintained. The former

were treated as conclusive on all the parties in interest, until re-
vived on appeal, while the latter were regarded as settling nothing
definitively. Then came the act of 1832, the framers of which
adopted most of the then existing provisions of the preceding
statutes, and added others, avowedly with a view of improving the
system they found already existing, but without alteration of its
fundamental qualities. Thus the new feature, authorizing the
register to direct a precept to the Court of Common Pleas for the
trial of an issue, without the intervention of a register's court, was
introduced to avoid unnecessary circuity; and the authority to issue
process to cause witnesses and parties to come before him, and for
the procurement of testimony, was conferred as convenient, if not
necessary, to the proper discharge of the duties with which the
officer had been previously charged. It is true the fifth section of
the act directs that every register shall have jurisdiction within the
county for which he shall have been appointed, of the probate of
wills and testaments, and of granting letters testamentary; but
this is nothing further or beyond the jurisdiction conferred by the
act of 1705, the language of which, in this particular, seems to
have been copied. That no such radical change in the existing
law as that proposed by the District Court was contemplated, is
obvious, not only from this, but also from the report of the civil
code commissioners accompanying the draft of the statute, to which
reference may with propriety be made when seeking the leading
intent, and in which there is not to be found an intimation of the
supposed alteration. The absence of an express declaration to
such effect, in the statute itself, is an impressive, though silent ad-
monition that no change in principle was intended. The introduc-
tion of the principle proposed would be of the gravest importance
in its effect upon titles to real estate, derived from testamentary
disposition or by descent; and the long-established mode of ascer-
taining them, by substituting the decree of a subordinate officer, or,
at best, the verdict of a single jury, for successive actions of eject-
ment, and two concurring verdicts conceded, by the law of this
state, as the right of every one litigating a claim to an estate in
lands, without reference to the peculiar form of his title. Besides,
if such were the rule, it is easy to see how, under the system as it
now stands, the rights of parties in interest might be fatally com-
promised without a hearing; and who, instead of the twenty-one
years allowed by the statute of limitations, would find themselves
estopped of the assertion of title by the lapse of a single year
allowed for an appeal to this court. This could not be where the

adverse title springs from a conveyance by deed; and why should it prevent, where the foundation of an estate is a last will, which, as a muniment, is of no greater dignity than a common-law assurance? These considerations force upon us the conviction that the lawmakers did not design the introduction. of consequences so novel and important, by implication; and this conclusion is in harmony with one of the soundest canons of construction, which teaches, as a rule of exposition, that public acts of the legislature are to be construed in reference to the principles of the common law; for an intent to make any innovation upon the common law is not to be presumed further than the case absolutely requires. The law rather infers, that the act of the legislature did not intend to work any alteration other than what is specified; and, besides, what has been plainly pronounced; for, as is naturally said, if such had been the design, it would have been expressed: Dwarris on Statutes, 43.

It is believed the construction I have intimated is in accordance with the sense of the profession everywhere. Fifteen years have run since the last act was made, and in that time many wills of land have been proved, and issues directed by the register and registers' courts, tried; and yet, this is the first instance, so far as I am informed, in which the principle adopted by the court below has been seriously insisted on. The maxim, therefore, of *cotemporanea expositio est fortissima in lege*, may well be invoked in aid of the argument. In proof of this general understanding, we have the authority of two cases decided by this court since the year 1832, which recognise the doctrine I have endeavoured to vindicate and point out the ground on which it rests. One of these is Smith *v.* Bonsall, already cited, decided in 1835, in which it was held that a will of lands *condemned* by the register, who refused to admit it to probate, might, nevertheless, be established by common-law proof, so as to found a title to realty. It is probable the will then in question was operative before the enactment of the statute; but this could make no difference in the effect to be given to the register's decree, if that were pronounced after. How this fact was, the report of the case furnishes no means of ascertaining, and it is not now recollected; but the uncertainty does not involve the other case of Lewis *v.* Pratt, 2 Whart. 81, decided in 1836; for there the issue of *devisavit vel non*, directed by the register's court, was finally determined in 1834. If it be conceded, that in the first of these cases the action of the register was, probably, before the act was made, it is scarcely to be believed it would not have been noticed by the bench or at the bar, had it been thought

to change the law. Such a construction would have ruled the last case differently from the actual determination of it; yet in neither was the act alluded to. Of course, the court were aware of its existence, and their silence in relation to it leads, irresistibly, to the conclusion, that it was thought there was nothing in its provisions to effect the supposed change; and, indeed, I am authorized to say, such was the opinion then entertained. As the court, as now constituted, is also of this opinion, it follows, the judge below committed an error in rejecting the plaintiff's offered evidence, for which the judgment must be reversed.

Judgment reversed, and a *venire de novo* awarded.